[Civ. No. 2899.   Fourth Dist.   Aug. 30, 1943.]

CITY OF CORONADO, Plaintiff and Respondent, v. CITY OF SAN DIEGO, Appellant; CALIFORNIA WATER & TELEPHONE COMPANY (a Corporation), Defendant and Respondent.

Clarence J. Novotny, City Attorney, Jean F. DuPaul, City Attorney, Bertrand L. Comparet, Deputy City Attorney, and Phil D. Swing for Appellant.

John R. Goodbody, City Attorney, Lindley & Higgins, Bacigalupi, Elkus & Salinger and Philip Storer Thacher for Respondents.

BARNARD, P. J.—This is an action for declaratory relief and to fix and establish certain water rights. Most of the facts are stated in our decision on a former appeal· (*City of Coronado* v. *City of San Diego*, 48 Cal.App.2d 160 [119 P.2d 359]), and need not be here repeated. We there reversed the judgment and remanded the cause for appropriate action in the trial court, with the suggestion that a new trial was unnecessary unless the parties desired to retry the issues as to their water rights apart from the contract of 1912, and as to the exact amounts of water which the city of San Diego might be compelled to furnish through a submarine pipe line.

Following that reversal a new hearing or trial was had. No attempt was made to establish any water rights independently of the contract of February 6, 1912, and no further evidence was introduced relating to that issue. The only thing that occurred in this connection was that the city of Coronado was permitted, over the objection of the city of San Diego, to amend the prayer of its complaint by substituting in two places the words "such of the waters of the Otay system" for the words "such of the waters of the Dulzura and Otay Rivers." We agree with the trial court that this amendment was unimportant, and it may be observed that other portions of the prayer and many allegations of the complaint, under which the claims of the city of Coronado were confined to the waters of the Dulzura and Otay Rivers, were not amended or changed. Some additional evidence was received on the other issue relating to the submarine pipe line.

The court then made findings and entered a new judgment,

both of which largely follow the findings and judgment made and entered at the first trial but with two important changes which are material here. The court found, and entered judgment accordingly, that a portion of the waters of the Otay and Dulzura Rivers either as impounded by the Otay dam and reservoir or otherwise, and of the waters of Pine Creek River as impounded by the Barrett dam and reservoir and the waters of the Cottonwood River as impounded by the Morena dam and reservoir have been dedicated forever to the use of the city of Coronado and its inhabitants, that the rights arising by such dedication and use of said waters were recognized, confirmed and defined in the contract of February 6, 1912, and that as a result thereof there is vested in the city of Coronado the beneficial right to the use of the required quantity of said water, together with other consumers of the California Water & Telephone Company, all as set forth in the contract of February 6, 1912, subject only to the limitation contained in said contract providing for a prorating in the event of a shortage of water. It was also found and decreed that the city of San Diego was under certain obligations with respect to furnishing water through the submarine pipe line, which will be later referred to and considered. From the judgment thus entered the city of San Diego has appealed.

It is first contended that the judgment is erroneous in that it awards to the respondents, subject to the agreement for prorating in the event of a shortage, the right to a portion not only of the waters of the Otay and Dulzura Rivers, whether impounded by the Otay dam or not, but also a portion of the waters of Pine Creek as impounded by the Barrett dam and of the Cottonwood River as impounded by the Morena dam, if and when any or all of these waters may be needed to fill the requirements of the respondents, with the result that the respondents are given the right to share in the waters which were developed and saved by the appellant after the contract of February 6, 1912, was executed and after the appellant purchased the Southern California Mountain Water Company's rights and water system and assumed its burden under that contract. It is argued that our prior decision limited the respondents to an interest or share in the waters of the Otay and Dulzura Rivers and excluded them from any interest in the waters of Pine Creek and the Cottonwood River, and in all waters later developed and saved

by the appellant, that this limitation has become the law of the case, and that in any event the respondents are not entitled to any of such additional waters under the terms of the contract of February 6, 1912.

On the first appeal this court pointed out that there was nothing to sustain the finding or conclusion of any particular dedication of waters to the respondents independently of and apart from the contract of February 6, 1912, and that if it was desired to adjudicate any such rights further evidence and findings were necessary. Upon the rehearing no attempt was made to establish any such rights and the respondents now expressly rely upon, and concede that their rights are to be determined in accordance with, the provisions of the contract of February 6, 1912. The main question on the former appeal was as to whether the respondents had lost the rights given them under that contract by failing to purchase and take all of the water necessary to fill their requirements. Among other questions presented was one as to whether the trial court had erred in finding and decreeing to the effect that these respondents had a prior right to all or so much as might be necessary for their requirements of the waters of the Otay and Dulzura Rivers and to the waters of Pine Creek as impounded by Barrett dam and of Cottonwood River as impounded by Morena dam. This court held that while there had been no breach of the contract of February 6, 1912, the court's finding and decree upon the other issue mentioned was neither supported by the pleadings nor by the evidence, and was opposed to established principles of law. The first judgment was reversed because it gave to the respondents water to which they were not entitled and also because it gave them, with reference to waters to which they were entitled, a prior and exclusive right in disregard of the contract which provided for prorating in case of shortage. To a certain extent, an interpretation of the contract of February 6, 1912, which was then before us, was involved in that decision. However, the matter of the interpretation of that contract, with respect to the exact waters to which it related, was not very fully presented in that case and we doubt that our former decision became the law of the case in that regard, except to the extent that we held that the respondents were not entitled to all of the waters in question and possibly in that we held that the awarding of subsequently developed water to the respondents was not supported by the evidence. While a

part of our former opinion may have a bearing on the problem now before us, as for instance the statement or inference that the evidence would not support a finding that these respondents were entitled to share in the new water developed by the appellant, it is unnecessary to base our decision on this appeal upon the doctrine of the law of the case. Our present views of the meaning that must be ascribed to the provisions of the contract of February 6, 1912, coincide with those we held at the time of the former appeal.

The respondents now rest their claims to water from this general source entirely on the contract of February 6, 1912, and the question is now more definitely presented as to what waters they are entitled to share in under the provisions of that contract. The appellant contends that the respondents are limited both by that contract and our former decision to a right to share in the waters of the Otay and Dulzura Rivers, as impounded by the Otay dam. The respondent city, the real beneficiary of any water in question, contends that it has the right to share in the waters impounded and taken into the "Otay system" as that system existed on February 6, 1912. It is argued that the Morena dam was then in existence and that although the Barrett dam was not constructed until 1922, all of the waters of Pine Creek were, prior to February 6, 1912, taken through what was known as Dulzura conduit and dumped into the lower Otay basin, and that it follows that there are no newly developed waters which need be considered. This is obviously incorrect as the height of the Morena dam was increased by the appellant after 1912 and the Barrett dam was erected by it in 1922. While some of the water of Cottonwood Creek or river was, prior to 1912, impounded by Morena dam and thence taken to the reservoir formed by the lower Otay dam, and while some part of the water of Pine Creek may theretofore have been taken through the Dulzura conduit to be then impounded by the Otay dam, it clearly appears that not all of the waters now impounded by the Morena and Barrett dams were taken to the lower Otay reservoir prior to 1912, and the trial court found that the appellant, by constructing the Barrett dam and raising the height of the Morena dam and by other improvements, has increased the net safe yield of the "Otay water system" by 8.35 million gallons daily over the safe net yield of that system at the time it was acquired by the appellant. The respondent water company contends that under the 1912 con-

tract the respondents are entitled to share in all the waters impounded by the so-called Otay water system, including the present Morena and Barrett dams, with all improvements that have been made by the appellant and also including any improvements or additions that may be made by the appellant in the future.

The respondents argue that the sale by the California Mountain Water Company to the city of San Diego covered not only its dams and reservoirs but also its potential water rights and that it follows that San Diego took all of these potential rights subject to the contract of 1912. It appears that the city of San Diego had certain water rights on these streams before this purchase was made. The question here is not as to what was transferred in this sale but as to what was covered in the 1912 contract, to which the sale was subject. That contract does not mention any particular streams, dams or reservoirs. It provides that the water furnished under its terms shall be delivered at a point below the lower Otay dam, which point is known as the Coronado ''Y.'' It provides that it is to be a continuing contract for the purpose of supplying those entitled thereto, including future consumers in the city of Coronado, ''with water from the system of water works of the said party of the first part, without any limitation as to the time when such obligation to so furnish water shall cease, and that the only changes to be made'' are as to the compensation for such water. And in the paragraph providing for proration in the event of a shortage the contract refers to the waters impounded ''in the reservoirs.'' At that time the water company's system consisted of the upper and lower Otay dams and reservoir, and the Morena dam and reservoir, and the Dulzura conduit. It seems reasonable that, in thus speaking of the water company's system of water works and of prorating the water ''in the reservoir,'' the parties were speaking of that water system as it then existed and especially when it was definitely provided that no changes were to be made with respect to this obligation to furnish water except as to the price to be paid. If the parties had intended the contract to cover not only the water system as it then existed but also future installations and developments it would have been a simple matter to have so stated. Not only was such an intention not expressed in the contract but we think it does not inferentially appear therein. There was nothing in the contract compelling the first party to increase

its system in the future or to develop more water, and at the time the contract was executed it neither intended nor was expected to do so. While the city of San Diego took over that water system subject to the burden of this contract this burden was limited by the provisions of the contract itself. It would be unreasonable to interpret the contract as extending to and covering any other water system which the purchaser of that system might own, and it would be equally unreasonable to extend it by implication to the additions which San Diego subsequently made at a cost of more than $4,000,000.

This view of the intention of the parties and the meaning of the contract is confirmed by the circumstances surrounding the execution of the contract, and by the subsequent actions of the parties. The Coronado Water Company had had certain rights in Otay River water and had formerly taken water from its wells a few miles below the site where the lower Otay dam was constructed. While that dam would or might interfere with its rights and its wells it had consented to the erection of the dam because of an oral agreement under which the Southern California Mountain Water Company agreed to furnish it water from the reservoir thus created. Water was so furnished for a number of years. In 1912, both parties knew of the proposed sale of the Southern California Mountain Water Company's system to the city of San Diego and this contract of February 6, 1912, was entered into, and the sale to San Diego was made subject to it, for the purpose of continuing the arrangement which had previously been carried out under the oral agreement. The parties contracted with reference to a definite water system which then existed, knowing that this system was about to be sold and that it would not be developed or increased in any way by its then owner. The matter was not questioned for some thirty years, during which period the city of San Diego has continued to take and use all newly developed water. When this action was started by the city of Coronado the pleadings and the prayer of the complaint set forth a claim of rights only in the waters of the Otay and Dulzura rivers. Neither by pleading nor evidence did it make any other claim until the hearing after a reversal of the former judgment. In its brief, on the former appeal, the respondent water company said: "This respondent concedes that appellant is entitled to the use of new water 'developed' after purchasing the system." And again, "there is no party to the litigation contesting appellant's

claim, so called, to 'new water.' '' However, they are now claiming a right to share in these new waters although the evidence is exactly the same as that held by this court to be insufficient to support such a claim.

This contract may reasonably be supposed to cover certain waters of Pine Creek and of Cottonwood River only because a portion of those waters were then being impounded by the Morena and Otay dams. Other waters, subsequently developed from these rivers and other watersheds, would not become subject to that contract merely because a part of the water system which had been affected by the contract was used as a conduit for these new waters. (*L. Mini Estate Co.* v. *Walsh,* 4 Cal.2d 249 [48 P.2d 666].) We think that the only reasonable interpretation of this contract of February 6, 1912, which determines the rights of the respondents, is that it was limited to this water system as it then existed and that it was not intended to, and did not, cover any future additions by which new water was developed.

The part of the judgment which we are now considering is somewhat ambiguous in that it awards ''a portion of the waters'' referred to therein to the respondents. While this may have been intended to relate only to a portion of those waters which we have held to be covered by the 1912 contract, it also might be interpreted as covering an interest in all the water subsequently developed and impounded by any of the named dams. This should be clarified and the judgment accordingly modified.

The only other point requiring consideration is with reference to the duty of the city of San Diego to continue some service of water through the submarine pipe line which connects with that city's water system at the foot of Market Street. On the prior appeal this court pointed out that some water had been delivered through this submarine pipe line during most of the years since 1907 and then said: ''The only evidence in this connection is that this submarine pipe line has been maintained for emergency purposes and that water was taken through it only at such times as pressure was reduced to a low stage at the northerly borders of the city of Coronado.'' It was then pointed out that such delivery of water had never been made pursuant to the contract of February 6, 1912, but that in a compromise agreement in 1936 it was agreed that such a service would be continued. We then held that ''the only reasonable effect of this agreement in this connection would be that the respondents would

have a right to have the delivery of water at the foot of Market Street continued to the extent such deliveries had been made in the past." That part of the judgment was reversed on the ground that it was too broad in that it might be interpreted as giving the city of Coronado a right to compel the delivery of all waters furnished under the 1912 contract at the foot of Market Street rather than at the Coronado "Y." While it was held that the right to such service of water was limited to the extent such deliveries had been made through the submarine pipe line in the past it was suggested that on a retrial the parties, if they so desired, might seek an adjudication of the exact amount of water for which delivery in that manner could be compelled.

On the retrial further evidence was produced on this issue, including evidence as to the maximum daily, monthly and yearly amounts of such deliveries in the past.

In Paragraph VII of the judgment which was entered the court decreed that the city of San Diego is also legally obligated to sell and deliver water at the foot of Market Street in accordance with the supplemental agreement of 1936 "to the extent such deliveries had been made in the past and as set forth in Finding of Fact No. XX." In Finding XX it was found that long prior to the supplemental contract of 1936 the city of San Diego had supplied practically continuously such amounts of water as were required by the respondent water company, as the conditions of pressure and other circumstances made desirable; that at times the amount of water thus taken has been as much as 500,000 gallons daily and 2,319,300 cubic feet per month; that said submarine line has been left open continuously by San Diego on its side of the same; and that the amount of water thus taken through the years "has been regulated and determined wholly by said California Water and Telephone Company and its predecessor in interest." It was also found in Paragraph XIX of the findings that the maximum amount of water thus delivered in any one year was 15,902,300 cubic feet. The evidence on this issue upon the retrial is precisely similar, in effect, to that of the first trial with the exception of the new evidence as to maximum quantities of water which had thus been furnished in the past. The finding that this submarine pipe line had been continuously left open by San Diego is not supported by the evidence. While there is evidence that it had usually been left open it appears without contradiction that at times

it had been closed on the San Diego side, and there is no evidence which would support a finding that the respondents have a right to have the line left open on the San Diego side at all times. The evidence is wholly insufficient to support the finding to the effect that the respondent water company could take water from this source at any time and for any purpose it desired to do so, and that the amount of water thus taken has been through the years regulated and determined wholly by that company and its predecessor. The evidence is exactly to the contrary. The form of this part of the judgment is as unfortunate as it is unnecessary and unjustified. However, it may easily be so modified as to conform to the real issues presented, to the holding of this court and to all of the evidence, including that produced upon the retrial.

Paragraph I of the judgment is modified by striking therefrom the first subparagraph thereof and inserting in lieu thereof the following:

"That a portion of the waters of the Otay and Dulzura Rivers in San Diego County, as impounded by the Otay Dam and Reservoir, and of the waters of the Pine Creek River and of the Cottonwood River, being that portion and to the extent that such waters were impounded by the Otay Water System on February 6, 1912, have been dedicated forever to the use of the City of Coronado and its inhabitants, and that the rights arising by such dedication and use of said waters were recognized, confirmed and defined in the contract of February 6, 1912, executed by and between the Coronado Water Company and the Southern California Mountain Water Company and, as a result thereof, there is vested in said The City of Coronado and its inhabitants, the beneficial right to the use of the required quantity of said water, together with the consumers of the California Water & Telephone Company, as set forth in the said contract of February 6, 1912, subject to any control and regulation thereby of the State of California and the California Railroad Commission, and subject to the limitation contained in said contract of February 6, 1912, in the following words:"

Also, Paragraph VII is modified by striking therefrom the last clause thereof which reads: "to the extent such deliveries have been made in the past and as set forth in Finding of Fact No. XX," and inserting in lieu thereof the following: "to the extent such deliveries have been made in the past and with a maximum amount of 2,319,300 cubic feet in any

one month and 15,902,300 cubic feet in any one year.'' As so modified, the judgment is affirmed.

Griffin, J., concurred.

A petition for a rehearing was denied September 28, 1943.